```
 1              IN THE UNITED STATES DISTRICT COURT FOR THE
                      EASTERN DISTRICT OF VIRGINIA
 2                        Alexandria Division

 3   O.S.                                  )
                                           )
 4                         Plaintiff,      )
                                           )
 5   v.                                    )  CIVIL ACTION
                                           )
 6   FAIRFAX COUNTY SCHOOL BOARD,          )  1:13-cv-1580
                                           )
 7                                         )
                           Defendant.      )
 8   _____)
```

 9                    REPORTER'S TRANSCRIPT

10                     <u>MOTIONS HEARING</u>

11                Friday, August 22, 2014

12                          ---

13

14   <u>BEFORE</u>:        THE HONORABLE T.S. ELLIS, III
                     Presiding

15   <u>APPEARANCES</u>:  CAITLIN E. McANDREWS, ESQ.
                     MICHAEL E. GEHRING, ESQ
16                   30 Cassatt Avenue
                     Berwyn, PA  19312
17
                         For the Plaintiff
18
                     JOHN CAFFERKY, ESQ.
19                   PATRICIA MINSON, ESQ.
                     Blankingship & Keith PC
20                   4020 University Drive Suite 300
                     Fairfax, VA  22030
21

22                          ---

23

24              MICHAEL A. RODRIQUEZ, RPR/CM/RMR
                     Official Court Reporter
25              USDC, Eastern District of Virginia
                     Alexandria Division

```
 1                    (Court called to order at 11:25 a.m.)
 2               THE CLERK:  O.S.. vs. Fairfax County Public
 3     Schools, Civil Action No. 1:13-cv-1580.
 4               Counsel, please not your appearance for the
 5     record.
 6               THE COURT:  All right.  Who's here for the
 7     plaintiff?
 8               ATTORNEY McANDREWS:  Caitlin McAndrews on
 9     behalf of the plaintiff.
10               ATTORNEY GEHRING:  And Michael Gehring on
11     behalf of the plaintiff as well.
12               THE COURT:  All right.  Who will argue
13     today?
14               ATTORNEY GEHRING:  I will argue, your Honor.
15               THE COURT:  All right.  Mr. McAndrews?
16               ATTORNEY GEHRING:  Mr. Gehring.
17               THE COURT:  Gehring.  I'm sorry.  It's
18     Ms. McAndrews.
19               ATTORNEY McANDREWS:  Correct.
20               THE COURT:  Thank you.
21               All right.  Who's here for the defendant?
22               ATTORNEY CAFFERKY:  John Cafferky, your
23     Honor, for the defendant.
24               ATTORNEY MINSON:  And Patricia Minson, your
25     Honor.
```

1    THE COURT:  All right.  Who will argue for

2    the defendant?

3    ATTORNEY CAFFERKY:  I'll be arguing.

4    THE COURT:  All right.  Thank you.

5    I think the best way to proceed this

6    morning, you all have filed very extensive briefs.  And,

7    in fact, I think it's fair to say that a small forest

8    has been sacrificed.  So I think I'm reasonably

9    informed.  It's a significant administrative record that

10   I've had to review, including two days of testimony.  I

11   think it was two days.

12   ATTORNEY McANDREWS:  Three, Your Honor.

13   THE COURT:  Three days.  It was over a

14   thousand pages, as I recall.

15   All right.  I think the best way, then, to

16   proceed is just to have you go as you did there.  Let's

17   begin with the plaintiff, because you're both seeking --

18   well, the plaintiff is seeking -- defendant is seeking a

19   judgment on the administrative record, and the plaintiff

20   is seeking a reversal or -- of the administrative

21   conclusion by the independent hearing officer.

22   So let's begin -- let's begin, then, with

23   you, yes, Mr. Gehring.

24   ATTORNEY GEHRING:  Thank you, your Honor.

25   Your Honor, as you noted, this is -- this

1    case has been extensively briefed.  There's a very

2    extensive administrative record.  And as the Court

3    noted, the Court has extensively reviewed the record.

4    So I'm not going to burden the Court with lot of

5    additional points.  If your Honor has any questions,

6    I'll be certainly glad to answer them.

7              Just a few main points I'd like to make.

8    The decision in this case by the hearing officer is just

9    remarkable.  I've never seen one like it that is so

10   one-sided in its presentation of the evidence in the

11   case.

12             The hearing officer cites to a few

13   documents, but largely this decision consists of

14   block-quoting conclusory testimony by school district

15   witnesses and giving it complete deference.  And when I

16   say "conclusory," things like, "Oh, O.S. made progress.

17   He did real well," completely ignoring contradictory

18   testimony that was brought out on cross-examination and

19   objective clear evidence that O.S. was not making

20   satisfactory educational progress in his program.

21             There is objective evidence in the record

22   that the hearing officer doesn't mention in his opinion,

23   not once.  Included in that objective evidence is

24   testing -- academic achievement testing conducted by the

25   Kennedy Krieger Institute during O.S.'s kindergarten

1     year in February and his 1st grade year I believe in

2     May.  And this is the exact period of time at issue in

3     this case.

4               That objective testing by Kennedy Krieger

5     Institute, a very well-respected organization that knows

6     what it's doing, found that O.S. had regressed in

7     academic areas and many behavioral areas as well between

8     February of his kindergarten year and May of his 1st

9     grade year, objective testing showing that his scores

10    went down.

11              And at the same time, the Court -- the

12    Kennedy Krieger found that his cognitive scores had gone

13    up quite a bit.  O.S.'s cognitive scores -- what his

14    potential was intellectually, those scores rose.  But at

15    the same time that those scores rose, his academic

16    achievement scores went backwards.

17              So the testimony -- the conclusory testimony

18    by Fairfax County Public School employees that O.S. was

19    making progress is entirely contradicted by this

20    objective testing as well as by their own testimony on

21    cross-examination where they were forced to concede that

22    O.S. was not making expected progress and that they were

23    also forced to concede that in certain areas his

24    progress was -- his academic achievement level was still

25    back in kindergarten.

1           At the end of 1st grade, O.S. was still

2    reading only 23 out of 40 kindergarten sight words.  So

3    after having been in the school district for all of

4    kindergarten and all of 1st grade, he was still only

5    reading about half of words that he should have been

6    able to read in kindergarten.

7           His -- he was receiving reading instruction,

8    pursuant to which his teacher testified that he had

9    essentially made two and a half months' progress in the

10   entire school year in 1st grade.  At that rate, he would

11   be far, far behind a few years from now.

12          The hearing officer in his opinion never

13   mentioned this testimony.  So it's our contention that

14   this -- the factual findings of the hearing officer

15   should not be given the deference that is ordinarily

16   given in this circuit to opinions of hearing officers.

17   This is not simply a case where he didn't -- wasn't

18   detailed enough in his explanation of the evidence or

19   talked about the evidence of one side more than the

20   other or the evidence favoring one side more than the

21   other.  As to certain key areas of evidence, he doesn't

22   mention it once.

23          And you'll see that pattern repeated in

24   Fairfax County Public Schools' briefs, not once in the

25   first four -- first two rounds of briefing.  We both

1  submitted motions for judgment on administrative record

2  supporting memorandum.  We were both submitting

3  responses.  You're not going to find word one about the

4  Woodcock-Johnson testing done by Kennedy Krieger

5  Institute that clearly shows that O.S. regressed

6  academically in his kindergarten and 1st grade years,

7  the exact years at issue here.

8           It's inconvenient for them, and it also --

9  by discussing it, it points out the fact that the

10  hearing officer doesn't mention it.  It's as if it

11  doesn't exist.  Objective achievement testing is used

12  widely in school districts as a way of measuring

13  academic progress.  Fairfax County Public Schools used

14  it themselves to measure O.S.'s academic progress.

15           Jessica Mendez, one of O.S.'s teachers in

16  1st grade, conducted objective achievement testing on

17  behalf of the school district in order to determine

18  O.S.'s eligibility under -- continued eligibility under

19  IDA and specifically testified on cross-examination that

20  she did so.  She relied on that rather than on progress

21  reports because the achievement testing is objective,

22  and the progress reports are less than objective.

23           So we have teacher after teacher saying he

24  made good progress and showing their progress reports,

25  which consist mainly of putting a 3 or a 4 in a box.

1    The data behind those progress reports has disappeared.

2    They destroyed it per policy of the school district.

3            In the areas where -- and many of those

4    progress reports did not measure progress objectively.

5    It was more of a subjective field test, essentially, by

6    the teacher.  In the areas where there was objective

7    testing, for the most part the progress reports actually

8    showed that O.S. was not doing well academically.

9            And that evidence is simply not discussed by

10   the hearing officer in his opinion.  And having

11   completely ignored this very compelling evidence of

12   O.S.'s lack of achievement and lack of educational

13   progress, this Court, I would submit, should not give

14   the hearing officer's finding of facts any deference at

15   all.

16           Instead, the Court should respectfully look

17   at the objective evidence of O.S.'s lack of achievement

18   and use that to measure whether O.S. made academic

19   progress or educational progress under his IEPs.

20           The *S.H.* court decision in this circuit,

21   *S.H. vs. Fairfax County*, makes it very clear that

22   progress or lack thereof is probably the best indicator

23   of whether a student's IEP's are appropriate or not.  In

24   this case, there was a clear lack of educational

25   progress, which demonstrates pretty clearly that the

1    IEPs were inappropriate either as written or as

2    implemented.

3              We have testimony in the record that the --

4    O.S. was not given his specially designed instruction in

5    reading and math according to the protocols of the

6    programs that were used by his teachers.  Research-based

7    instruction only works if you do it according to

8    protocols, and his teachers admitted they did not.  They

9    either didn't use a -- put O.S. in a homogenous grouping

10   with students of similar abilities and/or they gave it

11   20 or 30 minutes a day rather than 45 minutes per day

12   that is recommended and has been proven to work.

13             In this case, they did not follow those

14   protocols and, to a great degree, it did not work

15   because O.S. regressed in math and reading.

16             The district also failed him in terms of

17   behaviors.  In Exhibit 92 and elsewhere in the exhibits

18   that we've cited, there's clear objective evidence by

19   O.S.'s teachers that -- and this is from March of 2013,

20   so near the end of his 1st grade year -- that O.S. was

21   experiencing significant behavioral problems that were

22   never addressed by Fairfax County Public Schools.

23             He needs repeti- -- and this is, 5, "Most of

24   the time, needs repetition of instructions.  Appears to

25   have problems with short-term memory" -- I'm sorry.  I

1    read that one incorrectly.  "Loses track of what he is

2    doing.  Shows highly inconsistent or erratic patterns of

3    attention.  (Inaudible) inconsistently during the day.

4    Evidence of extreme performance inconsistency.  Shows

5    deterioration over time when he or she undertakes the

6    completed assignment."  This is by his teacher -- two of

7    his teachers:  Ms. Whiteman and Ms. Mendez.

8              And did the Fairfax County Public Schools

9    have a behavioral plan in place for O.S.?  No, they

10   didn't.  Did they ever do a functional behavioral

11   assessment to assess why O.S.'s behaviors were like this

12   and discover the best way to remediate them through a

13   behavioral intervention plan?  No, they didn't.

14             So O.S. had behavioral issues throughout

15   kindergarten and 1st grade that were completely

16   unremediated by the school district.  And at the same

17   time, we have the teachers coming in saying, "Oh, he did

18   great.  He's a great kid.  Loved having him."

19             But the objective questionnaire that was

20   filled out by Ms. Whiteman and Ms. Mendez shows very

21   clearly he had significant behavioral issues that were

22   interfering with his learning that were unaddressed by

23   the school district.  Again, this is not mentioned by

24   the hearing officer in his opinion.

25             THE COURT:  Anything further?

```
 1              ATTORNEY GEHRING:  Not at the moment, your
 2    Honor.  Thank you.
 3              THE COURT:  Mr. Cafferky?
 4              ATTORNEY CAFFERKY:  Thank you, your Honor.
 5              Let me start with the hearing officer's
 6    decision since that is where the Court starts.  I would
 7    submit to your Honor that it is abundantly clear from --
 8              THE COURT:  I didn't start with it.  He did.
 9              ATTORNEY CAFFERKY:  Very good, your Honor.
10    I would say in the Court's review, that would certainly
11    be something that --
12              THE COURT:  It's an appropriate place.
13              ATTORNEY CAFFERKY:  A potential starting
14    point.  And I would submit to you, your Honor, that the
15    guidance from the -- our Court of Appeals in this
16    circuit is very clear that the level of, you know,
17    findings have to be regularly made.  And "regularly
18    made" really means two things:  One, it can't be an
19    arbitrary process and it has to be a -- you have to give
20    the sides an opportunity to present their case and not
21    decide it in an arbitrary way.  And secondly, there's
22    got to be some articulation of the essential findings
23    and rationale of the -- by the hearing officer of his
24    decision.
25              But if you look at what the Court of Appeals
```

1     has said, it's very clear.  Our case law suggests that

2     the level of detail required of a hearing officer is

3     very low.  The Court said that in the *J.P.* case.  And

4     this decision here for Mr. Dangoya I would submit to you

5     goes far beyond the really very modest requirements of

6     articulation that the Court of Appeals has set forth.

7             He makes the essential findings.  He -- and

8     there's nothing -- and, in fact, the Court of Appeals

9     has been equally clear that there's nothing wrong with

10    the hearing officer citing to or quoting from the

11    testimony of some witnesses rather than others.

12            *Z.P.*, the Court says *Doyle* does not require

13    the fact -- the hearing officer to explain in detail its

14    reasons for accepting the testimony of one witness

15    over that of another.  And if you read through the

16    decision -- and I know you have -- I think you'll see --

17    we would certainly submit to you that Mr. Dangoya is

18    really very much going through a thought process when he

19    articulates and recapitulates and ultimately talks about

20    which witnesses he agrees with.

21            He doesn't have to parse every exhibit.  He

22    doesn't have to parse any exhibit, frankly, or the

23    testimony of all the witnesses.  And his decision is

24    actually quite extensive in terms of both the discussion

25    of the witness testimony and the reference to specific

1    exhibits and, in particular, two.

2          One is the IEPs because, of course, the

3    question is -- ultimately the question under *Rowley* and

4    the Fourth Circuit's decision in *A.B. vs. Lawson* is

5    whether the school division has offered and provided an

6    educational program that has a reasonable -- that's

7    reasonably calculated or calculated to provide some

8    educational benefit.  Some.  And, in fact, the "some" is

9    emphasized in the original.  It's a fairly modest

10    substantive standard, honestly.

11          And you can see from Mr. Dangoya's decision,

12    I would submit to you, that he relies on the IEPs, and

13    he also relies on the IEP progress reports.  I'm going

14    to talk more about those in a moment.

15          But in terms of meeting the standards for a

16    regularly -- excuse me -- findings being regularly made,

17    I think it's clear that he did that both in terms of the

18    detail of the decision and, from looking at the

19    transcript, you can see that this was a hearing

20    officer -- you know, sometimes they just sit there and

21    don't say a word.  Mr. Dangoya was very actively

22    involved in the questioning.  He --

23          THE COURT:  Like I'm doing right now,

24    sitting here just listening.

25          ATTORNEY CAFFERKY:  That's completely

1    appropriate, your Honor.  But he was certainly involved

2    in the proceedings, and I think the transcript does bear

3    that out.

4            In terms of the -- because I think this

5    issue gets to the issue of reviewing the hearing

6    officer's decision as well.  There has been a lot of

7    discussion about the use of -- one thing that's

8    extraordinary about this case -- and counsel obviously

9    talks about their experience of litigating these cases,

10   and I don't know that my personal experience is

11   certainly dispositive of that.  But all the decisions of

12   this Court that we cited to your Honor, ones that we've

13   been involved in, the *C.C.* case, the *S.H.* case, the

14   *Knight* case, the Symture (phonetics) case and on and on

15   and on, they routinely involve expert witnesses.

16           Here what you have, the witness set were the

17   school officials and then the parent.  So you didn't

18   have any expert witness at all.  And whether -- so

19   it's -- in my mind, it's sort of -- given that we know

20   parents have the burden of proof in this proceeding,

21   it's certainly theoretically possible to prove your case

22   through the other side's witnesses or the other side's

23   employees.

24           But I think it's very difficult and

25   challenging to do that because here you have the school

1    employees saying -- testifying that the IEPs were

2    appropriate and the student made at least some progress.

3    Maybe not all the progress that a regular non-disabled

4    student would make.  Not even necessarily all the

5    progress that they would like to have seen from this

6    student.  But the question is ultimately is this a

7    reasonable plan that's design to allow the student to

8    receive some educational benefit?  I think on the

9    evidence, the answer to that is clearly yes.

10          Now, with respect to -- counsel is certainly

11   right.  One measure -- not the only measure, but one

12   measure of whether a program is appropriate is whether a

13   student has made progress in it.  And so there's a lot

14   of -- there's a lot of discussion in the papers, as your

15   Honor knows, about the progress and the standards of

16   progress and so forth and so on.  A couple things I just

17   want to point out.

18          This is a student that during the times at

19   issue was five and six years old.  So we're not talking

20   about a junior high school or high school student or

21   even a later elementary school student.  There are many

22   ways to measure academic progress, particularly for such

23   a young student.  And counsel refers to the *S.H.* case

24   that was decided by Judge O'Grady.  I would commend that

25   to your Honor as well because that's the case where you

1    had some standardized testing.  And, of course, this

2    standardized testing can only really be given once a

3    year.  It's in an individual sort of artificial

4    environment.

5            What Judge O'Grady said there was -- and

6    Judge Brinkema likewise in the *Knight* case, you have to

7    look at a variety of different kinds of measures.  And,

8    in fact, a lot of times standardized testing -- this is

9    true as a general proposition, and I want to talk about

10   the evidence here in a minute.  You've got to look at

11   other measures.  The information that you get from

12   teachers, what are called criterion reference measures.

13           As your Honor knows, a standardized test is

14   something that's done with a norming sample and it's

15   administered to a -- you know, thousands of people to

16   come up with standardization norms and so forth.

17           You have something called criterion

18   reference tests which are how do you measure up

19   according to a certain criterion.  The DRA -- there's

20   reference to that -- the Developmental Reading

21   Assessment, I think it's called, Dolch words, which are

22   a list of the 200 most commonly used words, is another

23   measure.  They talk about that.

24           But IDEA itself recognizes that you can't

25   give a special education student a standardized test,

1    whether it's a Woodcock-Johnson, you know, that's

2    something that takes hours on a regular basis.

3            And if you look at what IDEA itself says you

4    should look at, one of the things that they specifically

5    mention are these IEP progress reports.  It's there in

6    34CFR300.320A3ii, which requires periodic reports on

7    whether the child's making progress vis-à-vis the IEP

8    goals.

9            So when counsel says -- and particularly in

10   our brief in opposition at Pages, I think, 9 through 17

11   or something like that, you'll recall that we set out

12   large chunks of those.  Those are not just -- those IEP

13   progress reports are serious things.  They are based

14   upon -- they are reporting in the categories of the

15   student's IEP and the student's educational plan.  So

16   they're particularly relevant.

17           And I think if you look at the testimony

18   from the teachers, Ms. Mendez, Mr. Rubenstein,

19   Ms. Green, Ms. Wallow, who prepared that, they don't

20   just -- I mean, I think it's a little insulting to the

21   teachers to think they just dream up a number and put it

22   on there.

23           Honestly, if you look at the narrative

24   comments that go along with it, you'll see there are

25   many -- when you look at IEP goals, things like can the

1    student formulate a couple sentences, can they do it on

2    their own or with one or two prompts, can they -- do

3    they have their math facts correct and many of the other

4    things that are referenced in our briefing, you can see

5    not just from the numbers, but from the narrative

6    comments that -- that -- just looking on Page 12 or Page

7    13, O.S. related an experience from his past by

8    spontaneously giving at least three details.

9            When you start out in June of 2011, he's

10   spontaneously able to relate some instances, but not

11   give the details.  And then by the following March, he's

12   mastered the goal.  He's able to share many personal

13   experiences using many details.

14           There are -- I'm not going to belabor it.

15   You can -- it's already in the administrative record, 55

16   and 61.  But there are many, many, many -- maybe we went

17   overboard, but we wanted to make the point these IEP

18   progress reports are important, they take them

19   seriously -- and by the way, with respect to the issue

20   of -- you know, if you look at the testimony at 724 to

21   725 and 773 to -74, what you'll see is that the notes or

22   scraps of paper or the underlying raw source material

23   that they use to keep track of this stuff they hold

24   to -- for reporting purposes.  They hold on to that at

25   the end of the -- till the end of the year.

1           And if the parent wants to look at them, all

2       they have to do is ask.  After that, they don't keep

3       them forever.  They're not required to.  They don't have

4       the space to do that.  The record of what took place

5       becomes the actual report itself.  So there's nothing --

6       we would submit, anything wrong with that.

7           The other thing I should -- the other couple

8       things I want to say about progress is -- generally want

9       to say about progress is O.S. is a student who's

10      eligible for special education.  And so -- and he's

11      very -- your Honor asked the question when we were here

12      for the -- here on one of the hearings on the motion to

13      dismiss about O.S.'s disabilities.

14          He's a very interesting youngster in the

15      sense of his disability classification is other health

16      impaired on the basis of this Doose Syndrome, which is a

17      seizure disorder, even though really in school he hasn't

18      had seizures, at least for a number of years.

19          But if you look at the report and the

20      testimony of the psychologist, Dr. Powell, and the

21      eligibility report, Administrative Record 7, it's clear

22      he's got a number of things going on.  He's got some

23      cognitive rigidity.  He's got visual and auditory

24      processing problems.  He's got pretty significant

25      attentional disorders or attentional issues working

1    memory problems, and stamina issues.  You've got a lot

2    going on for a five-, six-, seven-year-old.

3            It's not surprising -- and Judge Brinkema

4    says this in the *Knight* case.  It's not surprising that

5    a student with these kinds of disabilities isn't going

6    to progress at the same rate as some other students may.

7            And in O.S.'s case -- in O.S.'s case -- this

8    is something that was touched on in the brief, but maybe

9    not as much as it should be.  During 1st grade, which is

10   primarily the time period we're talking about -- there's

11   180 days in the school year -- O.S. missed 32 days, plus

12   parts of 19 other.  So he missed all or part of 51 days.

13   That's like missing -- and the principal Mr. Meyer and

14   Ms. Mendez, the teacher, talked about this.  That's like

15   missing more than a day a week.

16           So when we -- and they were asked a

17   question, "Does this have an impact on his education?"

18   They said absolutely, it did.  So when you look at

19   O.S.'s progress, you've got to keep in mind his

20   disabilities.  You've also got to keep in mind his

21   attendance during that year.

22           Now --

23           THE COURT:  What does the record show about

24   why he had those missing days?

25           ATTORNEY CAFFERKY:  It really -- it really

1    doesn't, your Honor.  I mean, I think it was a mixture

2    of medical appointments and tardies as a result of that

3    and are other absences.  I honestly couldn't say what

4    the specific -- but here again, he does have medical

5    issues.

6            And the other thing is, though, the time --

7    it isn't as thought the time was taken like a week here,

8    and then two weeks there or whatever.  It's, no, a day

9    or a couple of days here, and then, you know, later --

10   that makes it hard -- I think Ms. Mendez talked about

11   this -- to get kind of an instructional rhythm going,

12   particularly for a youngster who, as a 1st-grader, is in

13   his first year really of full-time school.

14           The -- counsel talked a lot about the

15   standardized testing, so I do want to talk about that.

16   A number of things important things to be said there.

17           First of all -- and this gets back to --

18   this gets back to why it's important to have witnesses

19   or expert witnesses if you're going to talk about an

20   esoteric area like educational testing.  A couple of

21   important things there.  Counsel said that the academic

22   testing done by Kennedy Krieger Institute reflected that

23   O.S. had regressed.  In fact, that's not at all what it

24   says.  If you look at Administrative Record 46 at Page

25   5, what it says, in comparison with previous

1   evaluations, "While O.S. has made developmental progress

2   in his academic skills, he has progressed at a slower

3   rate than expected."

4          Well, so what we know is he's progressed.

5   Maybe not up to someone's expectations.  Of course, the

6   tester didn't testify, and the only person who testified

7   about testing was Dr. Powell.  So -- and I want to just

8   say when we talk about people testifying, these

9   administrative hearings, it's not overly -- private

10  people from Kennedy Krieger, they testify all the time.

11  Ordinarily, they testify on the telephone.  It's not --

12  so I would very much disagree that the -- that the

13  Woodcock-Johnson testing shows regression.

14         But one thing the record does reflect is the

15  only psychologist who testified was Dr. Powell.  And

16  what Dr. Powell said is that the Woodcock-Johnson that

17  counsel's talked so much about in terms of its

18  objective, its this, its that, well, it's a test that's

19  administered -- to be administered to kids from

20  preschool age through adulthood.

21         So what Dr. Powell said is -- at 617 and

22  thereabouts is it's not sufficiently discriminating at

23  these -- you know, to really figure out whether a

24  student is making academic progress between kindergarten

25  and 1st grade.  Because the difference between getting

1    one level and another may be only one test item.

2              And that's why -- you know, so in terms of

3    the evidence about the testing, that's it.  Nobody else

4    talked about that.  And that's precisely why, if you

5    look at decisions from -- both from this Court, you

6    know, in the *Knight* case and the *S.H.* case and the other

7    courts, in the *Viola* case, there are many cases where

8    they say you've got to look at things other than

9    standardized testing.

10             The other thing is -- about the standardized

11   testing is if you look at the standardized testing that

12   counsel's talking about as Administrative Record 46 --

13   well, two things.  If you look at that report, you'll

14   see that the Woodcock-Johnson was one of seven -- at

15   least I think seven test batteries that this youngster

16   got on that day.

17             And that happens, because you can't bring

18   someone up to Kennedy Krieger three or four times, so

19   they run through a bunch of them.  But some of those

20   other standardized tests show progress.

21             And by the way, the Woodcock-Johnson has

22   actually got 22 subtests.  22.  He was given four of

23   them.  Now, I'm not necessarily faulting Kennedy

24   Krieger.  That have a lot of other tests.  But that's a

25   lot of extrapolation in the face of other evidence from

1     testimony from the teachers, their contemporaneous

2     reports.

3              And in terms of progress, one other very

4     important thing, which is the student had a private --

5     parents had a private tutor that worked with the student

6     for an hour a week on some academic things.  If you look

7     at Exhibit 87, those are the notes from the tutor.

8              The tutor was actually on their witness list

9     to testify.  They chose not to call the tutor to

10    testify.  But if you look at those notes, it's really

11    quite extraordinary.  The tutor says, "Progress and a

12    consistent gain on language arts.  Excellent progress

13    with sounding out words.  Continues to improve at a

14    quick pace.  Was able to reread a passage after word

15    that didn't make sense to him.  Such a big gain in

16    comprehension."

17             Well, you know, the tutor gets a little

18    piece of that, but the tutor works one hour a week.  The

19    school staff was working with the student 30 hours a

20    week.  So at least a little bit of that credit's got to

21    go to the school system, and that's a good metric from

22    an outside person saying, "Hey, O.S. really is

23    progressing."

24             THE COURT:  Anything further?

25             ATTORNEY CAFFERKY:  I don't -- I think

1   really everything else, your Honor -- I want to see if

2   I've addressed all of counsel's points.

3         I think -- oh, yes.  Yes.  The behavior --

4   the behavior plan.  There was -- there was some

5   testimony about that, about whether either an aide or a

6   nurse or a behavior plan was necessary.  And here again,

7   I would say to you that the evidence on that point is

8   that he didn't.  There was -- there was some discussion

9   in the record of another student that was picking on him

10  or he was mixing it up with.  There was a tussle about

11  an iPad at one point, and there were some other things.

12        But the principal testified these are --

13  these are six-year old-kids in their first full day of

14  school.  What was going on there was really nothing

15  particularly out of the ordinary.  And nobody who

16  testified, certainly nobody from an educational

17  discipline, said that that was necessary.

18        And really, for the most part, O.S. was a

19  happy, social, engaged student.  A behavior plan, just

20  for -- just so it's clear, what's called a functional

21  behavioral assessment and behavior intervention plan is

22  basically a tool that's used under IDEA where you have

23  students who have serious behavioral or conduct problems

24  and ordinarily discipline problems.  That was not O.S..

25        Otherwise, I'll just rely on my papers, your

1    Honor.  Thank you.

2            THE COURT:  All right.  I'm going to take a

3    recess now.  I want to consider what you've said, but

4    also to go back and look at some of the materials.  And

5    I'd like for you to return at 1:00, and I'll see if I

6    have any further questions or if I'm able to rule on it

7    at that time.

8            All right, I thank counsel.  Court stands in

9    recess until 1:00.

10           (Court recessed at 12:06 p.m.)

11           (Court called to order at 1:09 p.m.)

12           THE COURT:  All right.  Good afternoon.

13           Let me note at the outset every case that I

14   have the privilege of presiding over is important.  It's

15   important to the Court.  It's very important to the

16   parties.  But I think it's no exaggeration to say that

17   no case is more important to the parties than these IDEA

18   cases.  It's, after all, parents trying to do the best

19   for their children.  I'm a parent.  I know about that.

20           I'm actually a family member with three

21   severely afflicted children, cerebral palsy and autism.

22   I mean significant autism, not any functioning either.

23           I'm also the spouse of a school teacher, and

24   I know about school teachers and I know about schools.

25   And I know how important kids are to teachers in

general.  So -- and I know generally schools and parents
have the same goal.  It's to help the children, enrich
the children's life, prepare the children for life.
But, of course, reasonable people can disagree about how
to do that, and that's why we have these cases.

        I will tell you that I'm an old person.  I
predate all sorts of IDEA and handicapped children and
everything else.  I grew up in an era where if you were
left-handed, as I was, your left arm would be strapped
to your chest, and you would be forced to write with
your right hand.

        I also grew up in an era in another country
where I was born and raised where you attended school
and you sat two to a bench.  You wrote on a chalkboard.
And if you wrote something down that was wrong, one of
the monks or brothers would come by and rap you on the
knuckles, which was hard for me to -- I never became
accustomed to that.  I wasn't even a believer.

        But, in any event, things have vastly
improved since those days.  I think that children who
have various afflictions from relatively minor ones to
relatively severe ones are treated much, much better
today than they were then.  Back then they were -- they
were essentially ignored.  You were either one of the
kids they educated or you were called something like

1    retarded and ignored, put away somewhere.

2         So things are much better, but I just wanted

3    to point out that I certainly understand how strongly

4    parents and schools feel about their duty toward these

5    children who have to struggle with certain infirmities;

6    sometimes severe, sometimes not so severe.  But even the

7    not so severe infirmities create problems in the

8    development of these children and in the education.

9         At issue in this IDEA case is whether

10   Defendant Fairfax County School Board violated the IDEA

11   in failing to provide a free and appropriate public

12   education to Plaintiff O.S., a disabled student, during

13   his kindergarten and 1st grade school years.

14        Now, the hearing officers', independent

15   hearing officers', record -- and the record generally

16   reflects that O.S. is a student who, at all relevant

17   times, was enrolled in the Fairfax County Public

18   Schools.  And during the years in issue, which in this

19   case are kindergarten and 1st grade, he attended

20   Waynewood Elementary School.  It was the public school

21   immediately adjacent or next door to O.S.'s home.

22        There's, I think, no dispute that O.S.'s a

23   disabled student of average intelligence, but with

24   significant educational needs.  He's been diagnosed with

25   a seizure disorder, Doose Syndrome.  Whether he still

1    suffers from this syndrome or whether it's something a

2    child outgrows is not in this record.  But he did -- he

3    was diagnosed with seizure disorder, Doose Syndrome, a

4    hole in his heart, the atrial septal defect.  And I even

5    have some experience in that area as well.  One of my

6    sons is a pediatric cardiologist.  And -- well, enough.

7         And he's also been diagnosed with

8    ankyloglossia, a medical anomaly referred to as

9    tongue-tied.  He has stronger verbal than nonverbal

10   abilities.  He scores in the high average range for

11   verbal reasoning and in the low average range for

12   non-verbal reasoning.  He has some fine and gross motor

13   deficits that require occupational therapy, and he also

14   has articulation and speech sound errors that require

15   speech language therapy.

16        He was first referred for determination of

17   special education eligibility in October of 2009.  He

18   was found ineligible at that time.  But in May of 2010,

19   he was again evaluated and this found eligible to

20   receive special ed services under the disability

21   category of other health impairment; OHI, as its known.

22        This eligibility was predicated on O.S.'s

23   Doose Syndrome, also known as Myoclonic-Astatic

24   Epilepsy, and he began receiving special ed services

25   through a preschool program at Stratford Landing

1    Elementary.

2            In the summer of 2011, O.S. was nearing his

3    kindergarten school year at Waynewood.  And the Fairfax

4    County's IEP team met in May of that year to prepare an

5    IEP that would carry O.S. into his kindergarten year.

6            The IEP prepared by the team provided that

7    he would receive 15 hours per week, about half the

8    30-hour school week, of special ed services.  All of his

9    special ed services were to be provided in a general

10   education kindergarten classroom with a special

11   education teacher or instructional assistant working

12   with O.S. on his IEP goals in that classroom.

13           The IEP further provided that O.S. would

14   receive two hours per month or 30 minutes each week of

15   occupational therapy to be provided in a special

16   education classroom.

17           O.S.'s parents agreed with this IEP.  And on

18   December 14th, after O.S. had begun kindergarten,

19   December 14th, 2011, the IEP team again met to revise

20   O.S.'s IEP.  And the IEP team added 30 minutes per week

21   of adapted physical education to a corresponding annual

22   goal -- and a corresponding annual goal of physical

23   education.

24           The IEP team also added a speech evaluation.

25   The parents agreed with this IEP and the corresponding

1  speech evaluation.  The speech evaluation was conducted

2  on January 5th and January 30th of 2012, and it revealed

3  that O.S. had needs in the areas of articulation,

4  sentence structure, and following directions.

5          And thereafter, on or about February 10th of

6  2012, the IEP team added an articulation goal to O.S.'s

7  IEP as well as four hours per month or one hour per week

8  of speech language therapy to be provided in a special

9  education therapy room.

10          O.S.'s IEP team also increased his speech

11  language therapy to six hours per month or three

12  30-minute sessions per week with a focus on

13  articulation, following two-step directions, relating

14  experiences, and sequencing concepts.

15          In May of 2012, the record reflects the IEP

16  team met again to review O.S.'s annual IEP and to

17  prepare an IEP for his 1st grade year.  O.S.'s IEP was

18  revised to provide updated annual and short-term goals

19  in eight areas:  Communication, reading readiness,

20  reading comprehension, writing, writing readiness,

21  mathematics readiness, attending skills, and adapted

22  P.E.

23          The IPE [sic] team also implemented certain

24  steps to help O.S. in areas of need such as picture cues

25  to help O.S. follow multi-step directions and define

1    limits and frequent breaks to help O.S. focus in the

2    classroom.  And during this year, he received, pursuant

3    to the IEP, four hours per month of adapted P.E. and two

4    hours per month of occupational therapy and six hours

5    per month of speech language therapy, five of which were

6    in a special ed setting.

7            Now, at the beginning of his first year, 1st

8    grade year, 14 1/4 out of 15 hours of his special ed

9    time was in the general education classroom.  However,

10   the IEP team increased the amount of his special ed

11   support provided in a separate special ed classroom as

12   the year went on.  And in November of 2012, O.S.'s time

13   in the special ed classroom as opposed to the general

14   educational classroom increased to 7.75 hours per week

15   out of 15 hours of special ed.  And in January of 2013,

16   the IEP team further increased this to ten hours per

17   week.

18           Now, during his 1st grade year, for various

19   reasons not gone into in detail in the record, O.S. was

20   absent for 32 days, partially absent for an additional

21   19 days.  And as the staff testified, O.S.'s number of

22   absences that year was the highest of any student.

23           In May of 2013, Fairfax County conducted

24   psychological, sociocultural, and educational

25   evaluations.  The Fairfax County Eligibility Committee

1    reviewed this information, also reviewed private testing

2    of O.S. done by the Kennedy Krieger Institute.  And the

3    committee, which included O.S.'s mother and a family

4    friend, confirmed that O.S. continued to be eligible for

5    education on the basis of the OHI, which, as I said

6    earlier was, the "other health impairment" category.

7              Now, the IEP team reconvened on April 30th

8    and again on June 7 of 2013 to prepare O.S.'s 2nd grade

9    IEP.  The IEP team proposed new annual and short-term

10   goals in five areas:  One, writing and written language;

11   two, reading; three, mathematics; four, communications;

12   five, behavior improvements.

13             The IEP team further proposed that O.S.

14   continue to receive two hours per month of occupational

15   therapy and six hours per month of speech language

16   therapy, but that all of those hours be provided in a

17   special ed classroom or a separate therapy room.

18             The IEP team also recommended -- or

19   continued to recommend 15 hours of special ed services,

20   but recommended decreasing the amount of time in a

21   special ed class setting to five and a half hours a

22   week.

23             During the June IEP meetings, the parents

24   requested that a one-on-one aide be assigned to O.S..

25   The Fairfax County members of the IEP team considered

1    the request, but eventually determined that this wasn't

2    necessary; that a one-on-one aide was not educationally

3    necessary and would be unnecessarily restrictive for

4    O.S..

5              The parents also requested extended school

6    year services for O.S..  the parents claim that their

7    request was denied.  One of O.S.'s teachers testified in

8    the course of the hearing that the IEP team offered to

9    have O.S. attend summer school at Waynewood.  This

10   testimony was supported by a July 29th letter from the

11   school to the parents which stated that O.S.'s parents

12   chose not to have O.S. attend the offered site-based

13   summer school program.

14             Parents also sought during the IEP meeting

15   to have a full-time nurse assigned to the school.  That

16   was also not adopted by the committee or put in the IEP,

17   and the parents did not sign the June 7th IEP compared

18   to the previous ones.

19             Now, on July 16th of 2013, parents, by

20   counsel now, filed a request for administrative due

21   process hearing, which they were entitled to under the

22   IDEA.  And they requested changes to O.S.'s program and

23   placement, compensatory education, attorney's fees, and

24   costs.  And they specifically asked that the Fairfax

25   County school -- or contended that the Fairfax County

1   school failed to provide O.S. with a free and

2   appropriate public education in six ways:

3           First, they failed to provide appropriate

4   instruction in reading, math, and written languages.

5           They failed to provide occupational therapy

6   and speech language services.

7           Third, they failed to provide extended

8   school year services.

9           Fourth, they failed to provide a one-on-one

10  aide.

11          Fifth, they failed to program appropriately

12  for O.S.'s safety while at school.  That's the nurse.

13          And sixth, they failed to develop an

14  appropriate IEP for O.S. going forward.

15          Now, thereafter, the Fairfax County school

16  staff met with O.S.'s parents and counsel, and the IEP

17  team also reconvened three times between August 23rd and

18  29 to consider certain changes.  As a result of those

19  meetings, Fairfax County Public Schools offered O.S.'s

20  parents revised IEPs dated August 13th.  There was

21  another one on August 20th and another one on

22  August 28th.

23          These IEPs changed some of the goals,

24  accommodations, and services for the 2nd grade.  For

25  example, the annual writing goal was expanded from three

1    sentences to five complete sentences, and new writing

2    goals were added regarding pre-writing strategies

3    information regarding recent educational assessments.

4    The DRAs and the KTEA2 were added to Owens' reading goal

5    and math goal.

6         A reading goal was added to address O.S.'s

7    comprehension.  Poor short-term objectives to the math

8    goal were added, to include addition and subtraction of

9    all two-digit numbers.  An organization goal was also

10   added.  Short-term objectives were clarified in his

11   behavior improvement goal.  Checklists were added as a

12   progress measurement tool and a number of other

13   measurement tools.

14        O.S.'s parents elected not to accept the

15   revised IEPs.  And it appears -- although it's unclear,

16   but it appears he was home-schooled by his parents that

17   year rather than returned to Waynewood.

18        Now, the administrative due process hearing

19   then took place from September 17th through

20   September 19th, during which time the hearing officer

21   heard 14 witnesses.  And I've now reviewed the record.

22   There was 1,189 pages of transcript.

23        During the hearing, the school presented 13

24   witnesses, many of whom were qualified as experts

25   without objection.  And in contrast, the plaintiffs

1    presented one witness, O.S.'s mother.  The independent

2    hearing officer also received over 200 documentary

3    exhibits submitted by both parties.

4           Then in October of 2013, the independent

5    hearing officer issued his decision concluding that the

6    school had provided a free and appropriate public

7    education to O.S. and, thus, that he was not entitled to

8    compensatory education.

9           And there were several conclusions of law.

10   I'll just summarize briefly what the hearing officer

11   said.  He said that his IEPs were appropriately

12   developed.  He said that O.S. made educational progress

13   in speech, language, and occupational therapy, as

14   required by the IDEA, that Fairfax County did not deny

15   O.S. a free and appropriate public education by failing

16   to provide a full-time nurse and that it didn't deny

17   O.S. that education by failing to provide a one-on-one

18   aide and that O.S. did not require extended school year

19   services.

20          And in concluding -- in reaching his

21   conclusion, the hearing officer found the testimony of

22   all of the witnesses, along with the exhibits in the

23   administrative record -- in particular, the IEPs and the

24   progress reports -- supported the conclusion that O.S.

25   had made some progress under the applicable IEPs during

1  kindergarten and 1st grade and that O.S. did not need a

2  one-on-one aide, a full-time nurse, or extended school

3  year services.

4          In particular, he referred to the testimony

5  of Betty Whiteman, O.S.'s 1st year grade teacher, who

6  had testified that IEPs were appropriate and that O.S.

7  made good progress even if that progress was not the

8  progress you would expect from an average 1st grade

9  student.

10          Ms. Colleen Wheaton, O.S.'s 1st grade

11  special ed teacher, stated O.S. did not need full-time

12  assistance because he was able to focus and stay on task

13  even without a full-time aide.

14          Fonda Green, O.S.'s speech language

15  pathologist, who provided O.S. with speech language

16  therapy, she stated that O.S. was given a sufficient

17  amount of time per week in order to make progress.  And

18  she further testified that O.S.'s weaknesses in

19  articulation, sentence structure, and following

20  directions were addressed in his IEP.

21          He also -- the hearing officer also

22  referenced the testimony of Juanita Wallow, another of

23  O.S.'s special ed teachers, who testified that O.S.'s

24  kindergarten and 1st grade IEPs were appropriate and

25  further testified that it was unsurprising that a child

1    such as O.S. with disabilities would not progress at the

2    same rate as a child with no disabilities.  Wallow also

3    testified that O.S. had made, in her words, tremendous

4    progress even if it was progress at a slower rate than

5    his peers and that she was very pleased with it.

6         He also referenced Amy Herins, O.S.'s

7    special ed kindergarten teacher, who testified that O.S.

8    made good progress -- her words, "good progress" --

9    toward his areas of need.

10        He also referenced Martha Petroff, O.S.'s

11   occupational therapy teacher, who testified that O.S.

12   made "very nice progress," her words, toward his goals

13   and benefited from the educational program set by the

14   IEPs.

15        He further referenced Jessica Mendez,

16   another of O.S.'s special ed teachers, who testified

17   that any regressions O.S. had were not significant

18   enough to the point where O.S. couldn't recoup the

19   losses.

20        He also referenced Jean Vogt, V-o-g-t, and

21   expert in school health nursing, who testified that a

22   full-time nurse was not necessary for O.S. to be safe

23   because healthcare emergency guidelines were put in

24   place in case a seizure occurred that was particularly

25   severe.  And all school personnel, including the

1    school's health aides, knew about the healthcare

2    emergency guidelines.  The hearing officer also noted

3    there was a lack of any demonstrative evidence to the

4    contrary.

5           And the hearing officer acknowledged that

6    the IDEA certainly does impose a requirement -- does not

7    impose, rather.  He recognized that the IDEA doesn't

8    require the parents to hire experts and put on evidence.

9    It does mean that the parents have the burden, as I'll

10   come to come in a minute, but they don't have to present

11   any expert testimony.

12          And he did say, however, that the parents'

13   failure to offer any witnesses other than the parent

14   makes it extremely difficult, as he put it, to sustain

15   parents' position.  He said especially, quote, "in light

16   of the progress reports and testimony offered as

17   evidence in support of the Fairfax school position."

18          Now, that summary of what occurred in the

19   record is sufficient for now, but the analysis should

20   begin.  And to begin with, it's appropriate to set forth

21   clearly the standard of review District Courts must

22   apply in reviewing evidence and in reviewing a decision

23   of a hearing officer in an IDEA dispute.

24          In that regard, it's well-settled and

25   undisputed, really, by the parties that a District Court

1    reviewing the State administrative decision under the

2    IDEA may grant a motion for judgment on the

3    administrative record.

4              And in reviewing that decision, a District

5    Court engages in a modified de novo review making an

6    independent decision based on the preponderance of the

7    evidence while at the same time giving due weight to the

8    administrative findings provided they're regularly

9    found.

10             Because the District Court does not have the

11   same opportunity to hear and observe the witnesses as

12   they testify and thus to asses the weight and

13   credibility of the evidence presented at the hearing,

14   the hearing officer's administrative findings of fact

15   are considered prima facie correct, and the District

16   Court must explain its reasoning if it chooses not to

17   follow those findings.

18             Cases in that regard are, I think, legion.

19   And in this circuit I think probably the most oft-cited

20   case is the *Lawson* case at 354 Fed 3d.  The deference,

21   however, is limited to the hearing officer's factual

22   findings, and the District Court has to make an

23   independent de novo determination of the IDEA's legal

24   requirements.

25             Finally, it's well-established that the

1    party challenging the administrative record and the

2    administrative decision bears a burden of establishing

3    that the administrative decision was erroneous.

4           The Supreme Court's decision in *Shafer* makes

5    that clear, and the Supreme Court also made clear that

6    District Courts may not substitute their own judgment

7    and their own notions of sound educational policy for

8    those of the school authorities they review.

9           Thus, a reviewing court should, to the

10   extent possible, defer to considered rulings of the

11   administrative officers who also must give appropriate

12   deference to the decisions of professional educators.

13   The *M.M.* case at 303 Fed. 3d in the Fourth Circuit makes

14   that point clear at Page 533.

15          Now, those principles provide the lens

16   through which this Court must examine the administrative

17   record.  And there are some other principles that I

18   should recite.  Of course, the statute makes clear that

19   all States receiving federal funds for education must

20   provide every child between three and 21 who has a

21   disability with a free and appropriate public education.

22          And the reason that Congress passed that

23   statute is to ensure that all children with disabilities

24   have available to them a free and appropriate public

25   education that emphasizes special education and related

1    services designed to meet their unique needs and prepare

2    them for employment and independent living.

3              Now, under the IDEA, a free and appropriate

4    public education must provide disabled children with

5    meaningful access to the educational process, and the

6    educational benefit required by the IDEA must provide to

7    a disabled child in the least -- you've got to do it in

8    the least restrictive and appropriate environment with a

9    child participating, to the extent possible, in the same

10   activities as non-disabled children.

11             That provision has occasioned a good deal of

12   litigation, which isn't really at issue in this case.  I

13   think perhaps the most -- one of the most significant

14   provisions or legal principles at issue and applicable

15   here appears in the *Hartman* case at 118 Fed. 3d at Page

16   1,001 where the Fourth Circuit made clear that the IDEA

17   requires States to provide, quote, "specialized and

18   related services sufficient to confer some educational

19   benefit upon the handicapped child."

20             And that case makes clear that the act

21   doesn't require the furnishing of every special service

22   necessary to maximum each handicapped child's potential,

23   nor does the IDEA require a school district to provide a

24   disabled child with the best possible education.  The

25   *Rowley* Supreme Court decision recognized that principle

 1    at Page 192.

 2              These principles all reflect the fact that

 3    courts are very clear that courts, federal courts,

 4    cannot run local public schools.  Local educators

 5    deserve some latitude in determining the individualized

 6    education program most appropriate for a disabled child.

 7              Now, to accomplish the goal of providing

 8    specialized instructions to handicapped children, the

 9    IDEA mandates that school districts receiving federal

10    funds create an appropriate individualized educational

11    program -- that's the IEP -- for each disabled child.

12    And an IEP has to contain statements concerning the

13    disabled child's level of functioning, set forth

14    measurable annual achievement goals, described the

15    services to be provided, and establish objective

16    criteria for evaluating the child's progress.

17              A number of cases and the statute itself

18    makes that clear, but a number of cases also make that

19    clear including, as I said, the *M.M.* case in the Fourth

20    Circuit.

21              Every IEP must be prepared by an IEP team,

22    which team consists of at least one representative of

23    the school district, the child's teacher, the child's

24    parents or guardian, and where appropriate the child

25    himself.  Of course, for a five- or six-year-old, that

1    wouldn't be appropriate, but I've had cases where for

2    17- and 18-year-olds it is appropriate.

3              The IDEA further requires that the parents

4    or guardian of a disabled child be notified by the

5    school district of any proposed change to the IEP.  It

6    also requires parents or guardians be permitted to

7    participate in discussions relating to their disabled

8    child's evaluation and education.

9              And if the parent or guardian is not

10   satisfied with the IEP, they're entitled, as occurred

11   here, to request a due process hearing.  And that

12   hearing is conducted by an independent hearing officer.

13   And any party agreed by the findings may then bring suit

14   in State or Federal Court, which occurred here.  And at

15   such hearing, the party requesting relief -- in this

16   case, the plaintiff -- bears the burden of persuasion,

17   as the *Shafer* case in the Supreme Court made clear.

18              Here, as I said, the plaintiffs contend that

19   the hearing officer's decision has to be reversed for

20   four reasons:  First, that the hearing officer's

21   decision was not regularly made and should be reversed

22   solely because he required the parents to present

23   experts in order to prevail.

24              Second, the decision was based on anecdotal

25   testimony and is thus unsupported in the record.

1          Third, the hearing officer erred by not

2     awarding compensatory education for Fairfax County's

3     failure under the IDEA to provide extended school year

4     services, appropriate speech and language and

5     occupational services, and a one-on-one aide and a

6     school nurse.

7          And fourth, the hearing officer erred by not

8     ordering that Fairfax County develop an appropriate IEP

9     for O.S..

10         There was also a claim that he was not

11    educated in the least-restrictive environment, but that

12    claim doesn't seem to have been raised or exhausted

13    during the due process hearing and, therefore, can't be

14    reviewed here.

15         Now, the first matter the Court must

16    determine is whether or not the findings of the hearing

17    officer were regularly made and should be considered

18    prima facie correct under the law.

19         Administrative decisions are regularly made

20    so long as the process through which the decision was

21    made is within accepted norms of fact-finding process,

22    as the *J.P.* case makes clear at 516 Fed. 3d in the

23    Fourth Circuit.  In *J.P.*, for example, the Court found

24    that the administrative decision was regularly made

25    because the hearing officer allowed both parties to

1    present evidence and make arguments -- that occurred

2    here -- resolve the factual questions in the normal

3    way -- that's disputed here -- without flipping a coin.

4    No one suggests that this hearing officer flipped a

5    coin, threw a dart, or otherwise abdicated his

6    responsibility, but there is a challenge that I'm going

7    to address.

8              Neither party here questioned the process by

9    which the hearing officer conducted the hearing.  He

10   examined over 200 exhibits, heard three days of

11   testimony from 14 witnesses, and more than a -- 1100

12   pages of transcript.

13             And it's clear from a review of the

14   transcript that the hearing officer was not asleep at

15   the switch.  He was engaged in the hearing process.  He

16   interrupted when necessary to seek clarification, and he

17   regularly questioned witnesses personally.

18             His decision cites a number of times to the

19   testimony of witnesses and to exhibits in the record,

20   clearly indicating that his decision was made without

21   flipping a coin.

22             I've looked at this matter carefully.  The

23   defendant -- or I beg your pardon -- the plaintiffs

24   argue that -- in fact, that's the way the argument began

25   today, is that the argument was that the hearing

1    officer's decision was remarkable for its one-sidedness,

2    use of block quotes, and objective evidence not

3    mentioned, ignored compelling evidence.

4            I don't see it that way after a careful

5    review of his decision and this record.  He heard the

6    witnesses.  He engaged in the hearing.  He issued a

7    decision, and the decision refers to what he accepted as

8    persuasive there, the testimony of the witnesses.  It's

9    one-sided in the sense that he decided for the school

10   and he wasn't persuaded by the plaintiffs' testimony.

11           Now, plaintiffs, as I said, contend that it

12   was procedurally improper because the hearing officer

13   required plaintiffs to present expert testimony to

14   prevail.  I don't see that.  Plaintiffs certainly are

15   correct that the IDEA doesn't require a party to present

16   expert testimony in order to prevail.  It might have

17   been prudent to do so, but it doesn't require it.

18           However, plaintiffs are mistaken in assuming

19   that the hearing officer required plaintiffs to present

20   expert testimony or relied on the testimony of experts

21   no matter how conclusory merely because of their expert

22   status.

23           Ultimately, I think the plaintiffs' argument

24   on this point is baseless.  They assume that the hearing

25   officer credited the Fairfax County witnesses only

1    because they were experts.  Well, that's his -- that's

2    the plaintiffs' assumption.  But as I see it, he

3    credited them because they were persuasive.

4         Plaintiffs also assume that the hearing

5    officer didn't find for the plaintiffs only because they

6    failed to present expert witnesses.  Well, I think as a

7    tactical matter it might have been unwise not to present

8    expert testimony, but they certainly weren't required

9    to.  But then, again, he had to decide the case based on

10   the evidence presented to him.  And the evidence

11   presented to him persuaded him that the plaintiff was

12   not correct.

13        Plaintiffs further assume that the hearing

14   officer believed that expert witnesses can only be

15   rebutted by other expert witnesses.  I don't see that in

16   there.  Those assumptions are contrary to what I think

17   is the actual decision in which the hearing officer

18   explicitly stated he understood that the parents were

19   not required to present expert witnesses.

20        The hearing officer's decision relied

21   heavily on the testimony of the witnesses he heard,

22   which included experts, because, as the hearing officer

23   pointed out, and it was appropriate for him to point

24   out, plaintiff didn't present any testimony other than

25   O.S.'s mother.  That doesn't mean that O.S.'s mother

1    couldn't present significant or important evidence.  She

2    could.  After all, it's her child.  She lives with the

3    child.  She knows something -- a great deal about the

4    child.  But it doesn't mean that he has to accept her

5    testimony of the teachers who spend an awful lot of time

6    with the child as well and know the child quite well as

7    well.

8         So the hearing officer did not credit the

9    testimony of experts merely because they were experts.

10   He stated that he found all of the testimony of the

11   witnesses credible because they were supported by the

12   administrative record and because they were internally

13   consistent.

14        So, in the end, I don't find the argument

15   that the hearing officer improperly relied on expert

16   witnesses persuasive at all.

17        Plaintiffs also argue that the hearing

18   officer's decision was not regularly made because he

19   failed to base his decision on a preponderance of the

20   evidence insofar as he failed to acknowledge the

21   evidence presented by plaintiffs and instead relied

22   solely on unsupported anecdotal evidence -- that's

23   counsel's word -- wholly -- or "solely," unquote,

24   "unsupported anecdotal evidence presented by expert

25   witnesses.

1          Plaintiffs, as I've noted, indicated the

2     long blocks of testimony from witnesses that the hearing

3     officer relied on and testimony over plaintiffs'

4     submitted exhibits.

5          These allegations are not persuasive.  It's

6     appropriate to use block quotes if you find them

7     persuasive as a hearing officer.  And I do not find that

8     that contention renders the hearing officer's decision

9     unworthy of deference.

10          The Fourth Circuit has held that a hearing

11     officer is not required to explain in detail its reasons

12     for accepting the testimony of one witness over that of

13     another.  That's in the *Z.P.* case at 399 Fed. 3d at 298

14     and 306.

15          In this case, the hearing officer's -- well,

16     I should also note the *J.P.* case in which the Fourth

17     Circuit more recently made clear that the IDEA does not

18     require a hearing officer to offer detailed explanations

19     of his credibility or weight assessments.

20          In this case, the hearing officer's opinion

21     and factual findings were far from deficient.  He issued

22     a lengthy 25-page opinion complete with multiple

23     references to the administrative record and witnesses'

24     testimony.  And he explained that he found all the

25     witnesses credible and further explained which exhibits

1    and pieces of testimony he found most important.

2              He did notice and note that the plaintiff

3    offered no witnesses besides O.S.'s mother.  But

4    contrary to plaintiff's argument, the mere fact that the

5    hearing officer accepted the evidence of the school

6    board over the evidence of the mother is not a reason to

7    find the hearing officer's findings were not regularly

8    made, and they are entitled to some deference.

9              Now, we turn to the next issue.  The next

10   issue is plaintiffs' argument as to O.S. having been

11   denied a free and appropriate public education because

12   he failed to make progress under the two IEPs that the

13   parents signed off on.

14             First, plaintiffs claim that O.S. was denied

15   a free and appropriate education because he failed to

16   make progress under his kindergarten and 1st grade IEPs

17   as required, she says, by the IDEA.

18             And plaintiff also claims that O.S. actually

19   regressed during those years.  In other words,

20   plaintiffs argue that O.S.'s lack of progress shows the

21   IEPs were not reasonably calculated to enable the child

22   to receive educational benefits, as required under

23   *Rowley*.

24             Now, the chief evidence plaintiff relies on

25   are the two tests administered to O.S. by the Kennedy

1    Krieger Institute.  One test was administered in

2    February of 2012, another administered in April of 2013.

3            According to those tests, plaintiffs contend

4    O.S. regressed in every academic area tested.

5    Plaintiffs point out that O.S. was evaluated as below

6    average in two academic areas for which he was receiving

7    specially designed education and further note that O.S.

8    was below grade level in reading, writing, and math at

9    the end of his kindergarten year.

10           And finally, they state that his lack of

11   progress is evident because he finished his kindergarten

12   year one point below the reading benchmark.

13           Now, I think what the record shows, in fact,

14   as the hearing officer concluded, is that O.S. did make

15   some progress during his kindergarten and 1st grade

16   years and was not denied a free and appropriate public

17   education.  And there was plenty of evidence of this.

18           In fact, I don't have before me -- I want to

19   come back to that, but let me just summarize briefly

20   what the testimony was.  His special ed teacher

21   Ms. Wallow and regular ed teacher Ms. Behrens explained

22   that O.S. had made educational progress in many areas,

23   including his ability to write sentences, write and draw

24   in his journal, sound out and so forth.

25           I can find that testimony fairly -- well,

1    let me point out that the testimony and evidence that he

2    relied on were O.S.'s general education report cards;

3    O.S.'s IEP progress reports; contemporaneous written

4    comments in O.S.'s IEPs themselves; criterion-referenced

5    tests, such as the DRA; contemporaneous notes from

6    O.S.'s private tutor confirming that O.S. was making

7    gains.  This is the tutor hired by the parents, and he

8    said some fairly interested things.

9            He noted that the progress and a consistent

10   gain on his language arts progress is "quite exciting,"

11   he wrote.  He didn't testify, but these matters were

12   part of the record.  "Excellent progress with sounding

13   out words to spell in his book.  O.S. continuous to

14   improve at a quick pace.  He was able to reread a

15   passage after the words didn't make sense to him.  This

16   is such a big gain for comprehension."

17           And the hearing officer also relied on

18   progress reports and notes from speech language and

19   occupational therapists and day-to-day observations by

20   his teachers.

21           Ms. Wallow testified that O.S. showed

22   progress in his attending skills and his ability to draw

23   recognizable figures and further testified that O.S.

24   was, in her words, quote, "very successful," closed

25   quotes, from kindergarten.

1          Contemporaneous progress reports created by

2     both teachers document that progress in detail.  O.S.'s

3     kindergarten progress report states that O.S. made

4     outstanding progress during kindergarten.  The word

5     "outstanding" is from the administrative record exhibit.

6          That report further stated that O.S. could

7     identify all of his letters and sounds, showed respect

8     to teachers and classmates, displayed and interest in

9     math concepts and activities, and was beginning to write

10    stories using creativity and estimated spelling.

11         By his fourth quarter in kindergarten, O.S.

12    was progressing toward mastery of all his kindergarten

13    objectives in the are of mathematics, and he had

14    mastered his objectives in areas of language arts,

15    science, and social studies.

16         He made progress toward every one of his IEP

17    goals during kindergarten mastering his annual goal in

18    communication and making progress towards behavior

19    improvements and fine and gross motor skills writing and

20    adapted physical ed.  His own DRA score improved from 85

21    to 166 over the course of the school year.  O.S. also

22    made required progress during his first year.

23    Throughout the 1st grade, O.S. made progress toward his

24    IEP goals.  Maybe not as much progress as a normal 1st

25    grader might make, but he made some progress,

1  particularly in the areas of reading, math, and writing.

2       O.S.'s 1st grade teacher, Betty Whiteman,

3  testified that she saw O.S. improving in math and

4  written language throughout the entire year including,

5  as she put it, in her words, quote, "a great improvement

6  in effort and his ability to write on topic," closed

7  quotes.  Ms. Whiteman based this observation on both

8  tests that she administered and projects that O.S.

9  completed in her class.  O.S.'s scores on the

10  developmental reading -- the DRA improved.  Ms. Whiteman

11  also testified that there were no subjects where O.S.

12  actually lost ground.

13       By the end of the first grade, O.S. had made

14  progress on all his IEP goals.  Again, perhaps not quite

15  the progress one would expect of the average 1st grader,

16  but he made progress and had mastered some of them in

17  these areas -- in the areas of communication.  He made

18  good progress towards his goals on self-calming

19  strategies, fine gross motor skills, and writing.

20       Now, I think it is clear, as I've said a

21  couple of times now, that O.S. did not make the progress

22  that is expected of a typical 1st grade student.  But

23  even though that's true, both Ms. Wallow and

24  Ms. Whiteman testified that this was to be expected

25  since children of average intelligence, as he was, with

1    disabilities like O.S. typically progress slower than

2    children of average intelligence without disabilities.

3              Finally, Ms. Wallow testified that the fact

4    that O.S. missed the benchmark cutoff at the end of the

5    first grade by one point, stating that not all children

6    make grade level and that O.S. made the expected level

7    of progress despite being one point below the benchmark.

8    She stated that O.S. had made, in her words, quote,

9    "tremendous progress," closed quotes, during his 1st

10   grade year.

11             Now -- and it's important to point out that

12   O.S. made this progress despite the fact that he had

13   been absent for 32 days out of the year and partially

14   absent for another 19, which is essentially the

15   equivalent of missing one day every week of the 180-day

16   school year, roughly 180-day school year.

17             Now, all of this progress is documented on

18   O.S.'s first year -- or 1st grade IEP reports.

19   Throughout both O.S.'s 1st and kindergarten years, he

20   also documented progress not only in academics, but also

21   speech, language, and OT or occupational therapy.

22             Ms. Green, his speech language therapist,

23   testified that her therapy and service logs as well as

24   O.S.'s IEP progress reports showed that he was

25   progressing steadily in the area of communication.  And

1    by the end of his 1st grade school year, he had mastered

2    many of his communication goals, including pronunciation

3    of the L, Z, and R sounds.

4              O.S.'s occupational therapist, Ms. Petroff,

5    likewise produced progress therapy notes showing O.S.'s

6    progress during kindergarten and 1st grade, and she

7    testified that O.S.'s progress in occupational therapy

8    included his writing getting smaller, being able to hold

9    a pencil correctly, cutting with scissors, and other

10   fine motor activities, gluing and pasting.  This

11   progress was also included in O.S.'s IEP reports.

12             So it's -- the evidence is strong that he

13   made some progress and he was receiving some benefits.

14   And the evidence also doesn't show that he was

15   proceeding at the same rate as a child without his

16   disabilities, but he did show some progress.

17             Now, plaintiffs' argument to the contrary

18   are not persuasive.  It's true that O.S.'s teachers

19   testified that there were areas, letter sounds and sight

20   words, for example, in which O.S. did not make the same

21   rate of progress as his non-disabled peers.

22             But, of course, this is to be expected given

23   that one of O.S.'s disabilities is processing

24   difficulties, such as his problems with auditory memory.

25   The record does reflect that O.S. made steady progress

1    toward his goal, though; albeit, as I've said several

2    times, not at the same rate as his non-disabled peers

3    and that the progress he did make was documented.

4              Plaintiffs argue that report cards and class

5    work and other sorts of things shouldn't be credited

6    because such evidence constitutes subjective rather than

7    objective evidence.  That's meritless, in my view.  It

8    is true that the -- and I'll come to this -- that tests

9    that the Kennedy center gave him, the -- I'll come to

10   that in a moment.  It is true that that test furnishes

11   some support for the plaintiffs' position, but it

12   certainly does not contradict.

13             In fact, I think in the course of oral

14   argument, I think you quoted from that report.  The

15   report itself acknowledged that he had made progress.

16   But I think it's fair to say that that report -- those

17   tests that were given at the Kennedy center, the -- I

18   keep losing my reference to that.  What is it,

19   Woodcock -- here it is, Woodcock-Johnson III test at the

20   Kennedy Krieger Institute certainly provide some support

21   for the plaintiffs' contention.  But it is, in effect,

22   swamped by other evidence.  And it's no more objective

23   than the tests given by teachers in the classroom.

24             Now, I think it's clear that the hearing

25   officer properly concluded that O.S. was not denied a

1    free and appropriate education on the basis of the fact

2    that -- on the basis of his lack of progress.  The IEPs,

3    I think, were adequate and appropriately administered

4    such that he did show some progress.  He did get some

5    benefit, as the case law requires.

6            Next, whether O.S. required a one-on-one

7    aide.  Plaintiffs argue that O.S. requires a one-on-one

8    aide and denial of that deprived O.S. of a free and

9    appropriate public education.

10           Plaintiffs claim that a one-on-one aide is

11   necessary for O.S. to learn because of O.S.'s attention

12   and focus problems.  But the evidence contradicts that.

13   Ms. Whiteman, O.S.'s 1st grade teacher -- she's a

14   general ed teacher -- testified that O.S. did not

15   require a one-on-one aide because she and other staff

16   members in her classroom successfully used interventions

17   to help O.S. when he became distracted.

18           Ms. Mendez, a 1st grade special ed teacher

19   of O.S.'s, testified that O.S. was easily redirected

20   back on to task.

21           Ms. Wheaton, a special ed instructional

22   assistant in O.S.'s 1st grade class, testified that she

23   provided O.S. with prompts to stay focused, but that he

24   did not require those prompts full time.  On

25   cross-examination, she testified that O.S. sometimes

1   lacked focus and attention, but he did not require, in

2   her words, "somebody to be standing there next to him

3   all the time telling him to return to his work," closed

4   quotes.

5          She further stated that either she as an

6   instructional assistant or his teachers were successful

7   in their ability to address O.S.'s needs regarding his

8   attention and focus problems.

9          And there was the testimony of Mr. Anderson,

10  the special ed instructional assistant in O.S.'s 1st

11  grade class.  And he testified that O.S. sometimes

12  needed his assistance staying on task, but he also

13  stated that O.S. did not need a staff member assigned

14  just to him or primarily to him in order to stay on

15  task.  He explained that O.S. would, "jump right back

16  into whatever he had been doing after being prompted to

17  do so."  His words, "jump right back into whatever task

18  he was doing."

19         Ms. Green, O.S.'s speech language therapist,

20  testified that O.S. was easily redirected when he lost

21  focus.

22         And the principal, Meyer, testified that he

23  observed O.S. in class and noticed that when O.S. was

24  off task, his teacher would redirect him, and O.S. would

25  get back to work.  He further testified that, in his

1   view, O.S. doesn't need a lot of prompting, a lot of

2   cuing.

3          In fact, several of O.S.'s teachers,

4   including Ms. Wheaton, testified that having an aide

5   constantly hovering over him like a helicopter was

6   likely to stifle O.S.'s interaction with other students

7   and make him more dependent upon the aide rather than

8   encouraging and establishing independence.

9          No one other than O.S.'s mother testified

10  during the hearing that O.S. required a full-time aide.

11  Instead, the testimony and progress reports conclusively

12  establish that O.S., although having some attention

13  problems, was sufficiently and easily redirected.

14         Now, plaintiffs argue that his attention and

15  focus problems interfered with his learning because O.S.

16  was easily distracted and needed someone to get him

17  started and clarify directions for him.

18         In this respect, plaintiffs point to

19  Ms. Whiteman's testimony that O.S.'s attention, his

20  easily distracted problem, impacted his ability to stay

21  on task and make progress.  Well, it's undisputed,

22  clearly, that O.S. had some attention problems.  No

23  doubt about that.  However, plaintiffs fail to address

24  the fact that the record evidence supports the hearing

25  officer's conclusion that these attention problems were

1    adequately met by the teachers and instructional

2    assistants at the school.  Simply because a student has

3    attention problems does not automatically warrant a

4    one-on-one aide.  And I think the hearing officer's

5    decision in this regard is firmly supported by more than

6    a preponderance of the evidence.  A one-on-one aide was

7    not required.

8              Next, the plaintiffs further claim that O.S.

9    was denied a free and appropriate public education

10   because he should have received extended school year

11   services.

12             The Fourth Circuit has made clear that

13   extended school year services are only necessary to a

14   free and appropriate public education when the benefits

15   of disabled child gains during a regular school year

16   will be significantly jeopardized if he's not provided

17   with an educational program during the summer months.

18   But -- that's the *J.D.* case at 326 Fed. 3d at 567.

19             But extended school year services are not

20   necessarily required when a student has shown regression

21   during breaks and services because all students,

22   disabled or not, may regress to some extent during

23   lengthy breaks from school.  The Deburo (phonetics) case

24   at 309 Fed.  3d contains that information.

25             But, of course, that's a well-known fact to

1     all of us.  I attended so many schools in so many

2     countries and places that I don't remember it clearly.

3     But I don't have any doubt that I used every moment I

4     could to regress.  It was my goal to regress.

5              In any event, that's irrelevant.  What's

6     relevant here is whether the evidence is that -- or

7     supports the hearing officer's conclusion that he did

8     not require extended school year services.

9              The record reveals that O.S. never

10    demonstrated the type of regression that would require

11    extended school year services.  Ms. Wallow testified

12    that O.S. ended kindergarten at one point below the

13    reading benchmark for the end-of-the-year kindergarten.

14    And Ms. Whiteman testifies that O.S. started his 1st

15    grade year on grade level for reading, demonstrating

16    little, if any, reading regression during the summer

17    between kindergarten and first grade.

18             Ms. Mendez, O.S.'s special ed teacher,

19    testified that O.S. had demonstrated no regression that

20    he could not promptly recoup.  She also testified that

21    she didn't observe any regression significant enough to

22    warrant extended school year services during the winter

23    and spring breaks.

24             This testimony was further corroborated by

25    the testimony of Ms. Behrens and Dr. Powell, who stated

1      that O.S. objectively did not demonstrate regression.

2                    So based on this testimony and on the record

3      establishing that O.S. did not significantly regress

4      between his school years, defendant's denial of ESY or

5      extended school year services did not deprive O.S. of a

6      fair and appropriate public education.  The hearing

7      officer's decision in this regard is fully supported by

8      a robust record.

9                    Finally is the question whether O.S.

10     required a full-time nurse.  Under the IDEA, school

11     districts are required to provide where necessary school

12     health services and school nurse services as a related

13     service.  The regulations make that clear.

14     34CFR300.34(a).

15                   School health services mean health services

16     that are designed to enable a child with a disability to

17     receive a free and appropriate public education as

18     described in the IEP.  School health services may be

19     provided by a qualified school nurse or other qualified

20     person, as the regulation recognizes.

21                   Plaintiffs argue that O.S.'s seizure

22     disorder, which is reflected in his IEP, warrants a

23     full-time nurse.  That argument is not persuasive at

24     all.

25                   To begin with, O.S.'s doctors opine that

1    O.S. was no longer having seizures as of January 2012.

2    In fact, the record doesn't show that he had any

3    seizures during his school year.  And plaintiffs admit

4    that O.S. had not had visible seizures for some time.

5            I will say, though, that it's important for

6    people to be trained about seizures.  A child having a

7    seizure can be a frightening event for the child, very

8    frightening for the child, and frightening for the

9    school people.

10           But, in any event, fortunately none of that

11   occurred here.  It may be -- I don't know that there was

12   that much evidence in this regard, but this is -- the

13   Doose affliction that he had is something some children

14   outgrow.

15           In any event, Ms. Vogt, an expert in school

16   health nursing, testified that O.S. did not require a

17   full-time school nurse in order to be safe.  She stated

18   a school nurse rather than a healthcare aide is

19   necessary and appropriate only in situations where

20   medical and clinical judgment is necessary.

21           For example, when a student requires

22   reinsertion of a tracheotomy or tracheostomy or when a

23   student is on oxygen.  In contrast, O.S.'s situation,

24   she testified, doesn't require medical clinical judgment

25   because basic first aid could meet his needs in the

1    event of a seizure and clinical judgment doesn't come in

2    to play.

3              And she testified that the healthcare plan

4    in place for O.S., which was a standard Fairfax County

5    plan relating to seizures, was adequate and appropriate

6    and no specialized seizure plan was necessary in order

7    for O.S. to be safe.

8              So the lack of a full-time nurse at

9    Waynewood did not deprive O.S. of a free and appropriate

10   public education, and the record firmly supported the

11   hearing officer's conclusions in that regard.

12             So, in conclusion and in summary, O.S.'s

13   kindergarten and 1st year IEPs did provide O.S. with a

14   free and appropriate public education under the IDEA,

15   and the documentary evidence and testimony provide

16   persuasive, indeed overwhelming, testimony in support of

17   the conclusion reached by the hearing officer that he

18   made some progress during those years and that he was

19   safe and that he did not need a full-time aide and he

20   did not regress to the point that he needed the ESY.

21             In essence, the plaintiffs didn't not carry

22   their burden of proof in establishing that O.S. was

23   denied a free and appropriate public education in those

24   respects.

25             Accordingly, the hearing officer's decision

1    denying plaintiffs' claim for compensatory education

2    must be affirmed and judgment on the administrative

3    record must be granted in favor of the defendant and

4    against the plaintiff.

5              I thank counsel for your cooperation and

6    your helpful arguments.  I'll enter an order

7    accordingly.  Court stands in recess.

8              (Court adjourned at 2:20 p.m.)

9                        ---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATE

2

3          I, MICHAEL A. RODRIQUEZ, an Official Court

4    Reporter for the United States District Court, in the

5    Eastern District of Virginia, Alexandria Division, do

6    hereby certify that I reported by machine shorthand, in

7    my official capacity, the proceedings had upon the

8    motions hearing in the case of O.S. S. V. FAIRFAX COUNTY

9    SCHOOL BOARD.

10

11         I further certify that I was authorized and

12   did report by stenotype the proceedings in said motions

13   hearing, and that the foregoing pages, numbered 1 to 69,

14   inclusive, constitute the official transcript of said

15   proceedings as taken from my machine shorthand notes.

16

17         IN WITNESS WHEREOF, I have hereto subscribed

18   my name this __15th__ day of _October_____, 2014.

19

20

21

22                          _____/S/_____
                            Michael A. Rodriquez, RPR/CM/RMR
23                                Official Court Reporter

24

25